IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-CR-10059 |
| | ) | |
| CHARLES A. HEWITT, | ) | Hon. Joe Billy McDade |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

NOW COMES the United States of America, by Douglas J. Quivey, Acting United States Attorney for the Central District of Illinois, and Katherine G. Legge, Assistant United States Attorney, and hereby requests that this Court deny the defendant's motion for compassionate release (R.94), because, 1) he failed to exhausted his administrative remedies through the Bureau of Prisons, 2) he fails to present an extraordinary and compelling reason for release, as he presents no elevated health risk and has received the COVID-19 vaccine, and, 3) finally, releasing the Defendant would be woefully inconsistent with the factors under Title 18, United States Code, Section 3553(a). Accordingly, this motion should be denied.

# BACKGROUND

## I. Procedural and Factual Background[1]

Prior to the commission of the instant offense, the Defendant had a serious and escalating criminal career. The Defendant has been convicted of **burglary** (1988, probation revoked to 5 years imprisonment); **burglary** (1990; probation revoked to 4 years imprisonment); **burglary** (1995, 6 years imprisonment); **residential burglary** (1997, 9 years imprisonment); **theft** (2003, 7 years imprisonment); **resisting a peace officer, criminal trespass to building** (2012, misdemeanor, conditional discharge revoked to six days jail); **driving while license suspended** (2012, 40 days jail); and **aggravated criminal sexual abuse** (2013, 5 years imprisonment).  PSR ¶¶57-64.

Notably, the Defendant either committed new law violations while under parole or violated his parole in some fashion in nearly every case. PSR ¶¶57-64.

As it relates to the instant offense, the defendant was convicted for enticement of a minor, in violation of 18 U.S.C. § 2422(b), and penalties for registered sex offenders, in violation of 18 U.S.C. § 2260A.  He was sentenced, pursuant to a written C-agreement, to 300 months on the enticement charge and 120 months for the penalties for sex offenders charge, to be served consecutively.

---

[1] Our citations to the record use the following abbreviations: "d/e" means "docket entry"; "PSR" means "presentence report"; "R." followed by a number refers to the document bearing that number on the district court's criminal docket sheet in 18-10059.

The Court accepted the agreement and sentenced the Defendant to the total 420 months term of imprisonment to be followed by 10 years of supervised release. R.80. He was also ordered to pay $3,000 restitution to the three minor victims identified in the Indictment. R.48. Due to the fact his 2013 aggravated criminal sexual abuse also involved a minor, the Defendant was determined to be a repeat and dangerous sex offender against minors. PSR ¶67.

At the time of his PSR, the Defendant was 48 years old, and reported three ex-wives, a current wife who he was separated from, and a 22-year old girlfriend. PSR ¶83-87. Most of the information he reported to U.S. Probation was unable to be verified. *See generally* PSR. At the time of the PSR in January 2020, he reported his medical conditions to include knee pain and reported prior shoulder and hip surgeries. PSR ¶91-96.

As to the offense conduct here, the Defendant, at the time a registered sex offender, exploited minors online using mobile devices and social media applications to use a false persona to persuade, induce, and entice minor victims to produce and transmit sexually explicit images from the minors. PSR¶22-34. The Defendant used a fake name, fake picture, and fake persona to meet minors using social media applications such as MeetMe or Skout, often appearing to be a 15-year old male. *Id*. The investigation started when a 12-year old reported sending nude photos of herself to the Defendant and reported it to police. Through

electronic records and evidence seized from the Defendant's residence, agents were able to identify three additional minor victims within the Central District of Illinois who had been exploited by the Defendant to various degrees. In each case, the Defendant met the minors using his false 15-year-old persona, chatting with them to gain trust and rapport, and then switching identities to a "dad" or "uncle" of the purported 15-year-old. The communications between him and each of the victims was sexual in nature and detailed his knowledge of their minor age.

As detailed in the PSR (R.44) and the factual basis of the plea agreement (R.38), each of the Defendant's contacts with the minor victims in this case was extremely coercive, aggressive, and predatory. Within a day of meeting Minor Victim A online, the Defendant drove to her town to meet her to have sex and proceeded to pull her into nearby woods and began to kiss and grope her. Fortunately, she was able to call 911 and free herself from the Defendant; the Defendant fled before police arrived. During his communications with Minor Victim B, he threatened her repeatedly if she did not continue to send nude photos. The Defendant even sent Minor Victim B a screenshot of her house at one point, threatening to commit suicide, post her nude photos, kill her horses, or come to her house if she did not comply with his demands for sexually explicit photos or agreements to perform sex acts with him. The Defendant similarly met Minor Victim C, purporting to be the 15-year-old male, but quickly changed his persona

to someone older. He enticed Minor Victim C to produce sexually explicit images of herself to send to him, and he ultimately drove to meet her and had sexual intercourse with her. The evidence showed that Hewitt also filmed her while she was nude in the backseat of his car after they had intercourse, even though she told him to stop filming her.

At sentencing on January 29, 2020, Minor Victims A and C addressed the Court. The Court accepted the plea agreement and sentenced the Defendant to 420 months imprisonment, to be followed by 10 years of supervised release.

## II. Defendant's Incarceration and Health

Defendant is currently located at Federal Correctional Institution (FCI) Greenville in Greenville, Illinois with an expected release date of July 15, 2048, accounting for good time credit. R.80. He has received no disciplinary violations while in BOP. *Id.* The Defendant has completed approximately fifteen educational and rehabilitative classes on his instant incarceration. BOP categorizes him as a medium risk recidivism level. *Id.*

Defendant alleges that he suffers from chronic arthritis in his bilateral hips and knees. R.94. His medical records from BOP indicate he receives ongoing medical care for gastro-esophageal reflux disease, hyperlipidemia, migraines, arthropathy, bipolar disease, and depression. R.80. Furthermore, he has a large

hiatal hernia. R.80. According to this BOP medical records, he has received the COVID-19 vaccine, both doses being administered in April 2021.

The Defendant did not propose a release plan should his motion be granted. Notably, he "is not requesting that the sentence be abated. Rather, …that the balance of his sentence be served under home confinement." R.94.

### III.    FCI Greenville and BOP's COVID-19 Response

The defendant is currently incarcerated at FCI Greenville in Greenville, Illinois.   As of May 25, 2021, FCI Greenville's positivity rate has drastically decreased from earlier numbers. As of the date of this filing, zero inmates and zero staff members at were positive for COVID-19, and 683 inmates and 78 staff members that contracted COVID-19 had recovered.  There have been zero inmate deaths at FCI Greenville attributed to COVID-19.[2]  FCI Greenville, a medium security federal correctional institution with an adjacent minimum security satellite camp, houses approximately 1,181 total inmates in their population. *Id.*

Notably, the BOP has begun administering vaccines to both BOP staff and inmates.[3]  To-date, FCI Greenville has fully vaccinated 772 inmates and 153 staff (which would include the Defendant). In total, BOP has administered 180,635

---

[2] *See* BOP: COVID-19 Update, https://www.bop.gov/coronavirus/ (last accessed May 25, 2021).

[3] *See* BOP:COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/# (last accessed May 25, 2021).

doses of the COVID-19 vaccine. *Id. (*reflecting only staff and inmates that have completed both doses, thus being fully inoculated).  BOP has prioritized full-time staff be offered a location's vaccine first, as they present a higher potential risk for COVID-19 transmission between the community and inmates. Remaining doses are then provided to inmates based on priority of need in accordance with CDC guidelines.  As BOP is allocated additional shipments of the vaccine, it will be offered to additional locations and to additional staff and inmates at those locations.

Aside from an effort to vaccinate inmates, BOP continues to take significant measures to protect the health of the inmates in its charge in light of the COVID-19 pandemic. BOP is still prioritizing its expanded authority to use home confinement. In a letter to representatives of the Federal Public Defender's Office dated April 20, 2020, BOP noted that it had placed 1,279 inmates on home confinement. Since that letter was issued in April, the number of inmates on home confinement (including inmates who have completed service of their sentence) has swelled to 25,890. *See* https://www.bop.gov/coronavirus/ (last visited May 25, 2021).

## LEGAL FRAMEWORK

A sentence of imprisonment is a final judgment that a court cannot modify unless certain limited exceptions exist. 18 U.S.C. § 3582(b).  Once such exception

is for compassionate release under 18 U.S.C. § 3582(c)(1)(A). That authorizes a district court, in certain circumstances, to grant a defendant's motion to reduce his term of imprisonment. *Id.* § 3582(c)(1)(A). The Court's review of a request under § 3582 takes place in two phases. First, the Court must consider whether the Defendant has exhausted his administrative remedies. Second, if the Court determines that the exhaustion requirement has been met, the Court may go on to perform a substantive analysis, granting compassionate release only "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).

## I.    Exhaustion

A court "may not modify a term of imprisonment" on the defendant's own motion (as opposed to one from the BOP) until "after the defendant has fully exhausted all administrative rights to appeal" from the warden's denial of his require or "the lapse of 30 days from the receipt of such a request by the warden, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The Seventh Circuit has held that this is a mandatory, claim-processing rule. *United States v. Sanford*, 986 F.3d 779 (7th Cir.) (holding the exhaustion requirement under § 3582(c)(1)(A) to be

mandatory before a district court can entertain a compassionate release request). Thus, this must be enforced when invoked. *Id.*

## II. Substantive Analysis

The Defendant must satisfy four prongs before a Court can grant him to compassionate release. The Court must find that: (1) extraordinary and compelling reasons exist to reduce the sentence; (2) a reduction is consistent with the Sentencing Commission's applicable policy statement; (3) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and (4) the factors presented under 18 U.S.C. 3553(a) warrant a reduction.

In looking at the substantive analysis of compassionate release requests, the Sentencing Commission has issued a policy statement addressing reductions of sentences under Section 3582(c)(1)(A). *See* USSG § 1B1.13. The policy statement explicitly addresses only motions for sentence reductions filed by the BOP. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). But, in the case of an inmate's motion, the policy statement is a "working definition" of what constitutes an extraordinary and compelling reason justifying compassionate release. *Id.*; *see also United States v. Welker*, No. 13-cr-10061, 2020 WL 7091540, at *2 (C.D. Ill. Dec. 4, 2020) (summarizing the continued relevance of USSG § 1B1.13 after *Gunn* and

giving "great weight to the Sentencing Guidelines regarding motions for compassionate release even though they are not binding").

While the Seventh Circuit recognized that the current policy statement was not binding, it did *not* abandon the policy statement or give the District Courts *carte blanche* to determine that just any circumstance amounted to "extraordinary and compelling." Rather, the Seventh Circuit stated that application Note 1 to Section 1B1.13 still plays an important role in a district court's determination of whether "extraordinary and compelling reasons" exist in a particular case. The Seventh Circuit expressly stated that "the Commission's analysis can guide discretion without being conclusive." *Id.* at 4. Further, the Seventh Circuit warned that a district court "who strikes off on a different path" than that laid out by the policy statement risks a finding that it has abused its discretion by reading the statutory phrase "extraordinary and compelling reasons" more broadly than the "working definition" provided by the policy statement. *Id.* Accordingly, post-*Gunn* the Court must still consider the policy statements in determining that a defendant's condition is "extraordinary and compelling."

An application note to the policy statement specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." The medical conditions standard can only be met in two ways. First, it is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer,

amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I)      suffering from a serious physical or medical condition,
>
> (II)     suffering from a serious functional or cognitive impairment, or
>
> (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)–(C).

Following *Gunn*, it is clear that the phrase "extraordinary and compelling" is the touchstone of the Court's analysis. This standard requires a defendant to prove that there is something truly unusual or strange about their particular circumstance as compared to other inmates. The categories in the USSG policy statement encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to broad groups of the prison population. It is for this reason, that the Seventh Circuit noted the policy statement provide an excellent guide to what constitutes an extraordinary and compelling situation. To classify COVID-19 by itself as an extraordinary and compelling reason would not

only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering [BOP's] statutory role, and its extensive and professional efforts to curtail the virus's spread")(citations omitted).

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). As noted in other compassionate release responses by the Government, if an inmate has a chronic medical condition that has been identified by the CDC as placing the inmate at an increased risk of severe illness from COVID-19,[4] that condition may satisfy the "extraordinary and

---

[4] *See* Centers for Disease Control, COVID-19, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited April 21, 2021). People with the following conditions **can be more likely to get severely ill** from COVID-19:
- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD, asthma, interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome

compelling reasons" standard. Under these circumstances, the combination of COVID-19 and a chronic condition defined by the policy statement (*i.e.*, one "from which [the defendant] is not expected to recover") may be found to be "serious" as it will "substantially diminish [] the ability of the defendant to provide self-care within the environment of a correctional facility." This is true even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). Similarly, in light of COVID-19, a defendant "experiencing deteriorating physical or mental health because of the aging process" may be found to have a substantially diminished ability to provide self-care within the environment of a correctional facility when that condition is combined with COVID-19. This is possible even where a defendant's age-related decline in health otherwise would not have qualified. *Id.* at (A)(ii)(III).

Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the

---

- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies, or hypertension)
- HIV infection
- Immunocompromised state
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease
- Substance use disorders

modification of lawfully imposed sentences in response to a viral pandemic. Nor does Section 3582(c)(1)(A) stand for the proportion that BOP should consider release of an inmate who provides scant proof that his health was negatively impacted, especially after receiving vaccination.

As the movant, the defendant bears the burden of establishing that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

As discussed below, the Defendant has not met these requirements, and the Motion must be denied.

## ARGUMENT

The Defendant's Motion fails outright because he did not exhaust his administrative remedies through BOP. But, even if he had exhausted his remedies, he nonetheless fails to present an extraordinary and compelling justification for release, he has received both doses of the COVID-19 vaccine, and he further cannot satisfy the § 3553 factors and remains a danger to the community.

### I.    Hewitt failed to exhaust his administrative remedies

The Defendant provides no proof that he has exhausted his administrative remedies within BOP prior to filing this Motion with the Court, nor even suggests that he did so.  R.94, Sec. IV.  In fact, BOP confirmed that the Defendant did not file a motion for compassionate release with the institution. R.80.  The

Defendant urges the Court to waive this requirement, relying on an outdated district court decision that the Seventh Circuit clearly rejected in *Sanford*. 986 F.3d 779.  The exhaustion requirement is a mandatory claims-processing rule and must be enforced when invoked. *Id.*

Thus, the Defendant's failure to request compassionate release through the BOP by making a request to the Warden warrants summary dismissal of this Motion.

## II.    Hewitt fails to establish an extraordinary and compelling reason for a reduction in sentence.

Even if the Defendant could show that he exhausted his administrative remedies, his Motion still fails on the merits: he fails to present any health concern that rises to an extraordinary and compelling reason for release <u>and</u> he has been fully vaccinated for COVID-19.

The mere existence of the COVID-19 pandemic, which poses a general threat to everyone, does not meet the criteria of the Sentencing Commission's policy statement as an extraordinary and compelling reason for release. USSG § 1B1.13 & cmt. n.1(A)(ii)(I). It alone is not a basis for a sentence reduction. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but it would be detrimental to BOP's comprehensive COVID-19 regimens, would result in inconsistent treatment of inmates, and would

undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a worldwide pandemic.

Nevertheless, COVID-19 is not irrelevant to a court's analysis of a compassionate release motion. If an inmate has a chronic medical condition that the CDC identifies as elevating the inmate's risk of becoming severely ill from COVID-19, as identified above in footnote 4, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an extraordinary and compelling reason absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I).

Here, Hewitt alleges he is a "changed man" while also acknowledging he has only served approximately 3.5% of his sentence. He notes chronic arthritis in his Motion but does not provide any evidence that this places him at a higher risk of severe illness should he contract COVID-19. BOP records confirm his medical

concerns include GERD, for which he was prescribed medication, and has a hernia. While his conditions, no doubt, provide him some discomfort and concern, these are not conditions that the CDC recognizes as conditions that may place someone at greater risk of serious adverse health consequences as it relates to COVID-19. Overall, Hewitt is a 49-year-old male in relatively healthy condition, but-for his arthritis issues. Accordingly, he does not present sufficient evidence to establish that he is at higher risk of complications from COVID-19.

Additionally and perhaps most importantly, Hewitt has received both doses of his COVID-19 vaccine, thus taking a significant step in greatly reducing his risk of severe illness from contracting COVID-19. Even more fortunate for the Defendant, his facility, FCI Greenville, presently has zero active cases. Indeed, in the nature of a pandemic, COVID-19 poses a general threat to every non-immune person, and there is nowhere in the world that is immune from the threat. Here, the Defendant has fortunately availed himself of the most readily available tool to fight reinfection: vaccination.

Accordingly, the Defendant has not met the burden of providing a compelling reason for his release as his health diagnoses to not demonstrate an increased risk of severe illness to COVID-19, and his concerns are largely vitiated by the fact he has received the COVID-19 vaccine already.

### III. The § 3553(a) sentencing factors, danger to community, and policy statement concretely weigh against release.

Alternatively, Defendant's request for a sentence reduction should be denied because he has entirely failed to demonstrate that he is not a danger to the safety of the community or otherwise merits release under § 3553(a) factors. Under the Sentencing Commission's policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the Section 3553(a) factors as part of its analysis. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Even in spite of the fact the Defendant submitted no release plan, whether a residence would be suitable or not remains largely irrelevant: his sentence, history of recidivism, dangerousness, and § 3553(a) factors strongly disfavor release, regardless of the home to which he would be released. Even more so, based on the facts of this case, he could continue to perpetuate similar crimes of online sexual exploitation of minors directly from a residence, as he specifically did in the offense conduct in this very case.

This Defendant is clearly a danger to the community and his sentence of imprisonment is necessary to protect the public from further crimes. The Defendant's criminal history alone is clear enough of the defendant's predatory and recidivist nature: numerous felony convictions for which he was in and out of

prison, two "hands-on" sex offenses involving minors, and a violation for being a registered sex offender while committing new sex crimes involving minors. The Defendant has been determined to be a repeat and dangerous sex offender against minors—a categorization he has squarely earned based on these convictions.

It is clear that by the time the Defendant was committing the current enticement of a minor, none of the Defendant's prior prison sentences, nor the court-ordered conditions of probation, parole, or supervision, successfully deterred him from further serious and predatory criminal conduct (noting too that in committing the current offense, the Defendant was also violating his sex offender registry by using false names online). Overall, this Defendant's history of persistent, coercive, and continuous unlawful conduct exploiting minors demonstrates that nothing short of his incarceration will protect the public— specifically minors—from further crimes. To further lessen his sentence would fail to reflect the seriousness of the Defendant's offense, promote respect for the law, or provide adequate deterrence.

To-date, Hewitt has served roughly 3.5% of his 420-month sentence. At sentencing, this Court imposed the term of imprisonment based on an assessment of the § 3553(a) factors, directly addressing the agreement the Defendant wished this Court to accept. The Defendant presents no information that changes this Court's calculus or justifies his release to home confinement in light of his § 3553(a)

factors and dangerousness to the community. Rather, releasing him now would depreciate the seriousness of his offenses, erode respect for the law, and fail to provide just punishment.

FCI Greenville—like every BOP facility that has contracted COVID-19—is working aggressively to contain and mitigate the spread of COVID-19 and has largely been successful; many BOP facilities that had rampant outbreaks a month or two ago have since seen a drop in positive cases. Furthermore, this Defendant directly benefited from BOP's aggressive vaccination roll-out and is now fully protected against COVID-19.

In short, there is nothing in Defendant's Motion that, in any manner, suggests compassionate release would be an appropriate remedy for this Defendant, even and especially upon his failure to exhaust administrative remedies within BOP, lack of any significant health concerns, and acceptance of the vaccine. The Court already weighed the § 3553 factors in accepting the agreement to 420 months and there is no basis presented in the Motion to disturb those findings now.

## CONCLUSION

For the reasons stated above, the Government respectfully requests that this Court deny the Motion with prejudice because the Defendant has not presented any evidence that he has an extraordinary and compelling justification for release

or that he is no longer a danger to the community and that a sentence reduction is warranted under the § 3553 factors.

Respectfully Submitted,

UNITED STATES OF AMERICA

DOUGLAS J. QUIVEY
ACTING UNITED STATES ATTORNEY

By:  /s Katherine G. Legge
     Katherine G. Legge
     Assistant United States Attorney
     Office of the United States Attorney
     211 Fulton Street, Suite 400
     Peoria, Illinois 61602
     Tel: 309-671-7050
     Fax: 309-671-7259

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2021, I caused a copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will cause notice and a copy of the foregoing to be sent to all parties of record.

s/ Brianna Gibbs