1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF ILLINOIS

3

4

UNITED STATES OF AMERICA,     )
5                              )
            Plaintiff,         )
6                              )
        vs.                    )     Criminal No. 1:18-10059
7                              )
CHARLES A. HEWITT,             )
8                              )
            Defendant.         )
9

10              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOE B. McDADE
11                SENTENCING HEARING
             JANUARY 29, 2020; 1:54 P.M.
12                 PEORIA, ILLINOIS

13

APPEARANCES:

14

15   For the Government:       KATHERINE G. LEGGE, ESQUIRE
                               Asst. United States Attorney
16                             211 Fulton Street, Suite 400
                               Peoria, Illinois 61602
17                             (309) 671-7050

18

19   For the Defendant:        WILLIAM C. LOEFFEL, ESQUIRE
                               William C. Loeffel, P.C.
20                             4318 Arn
                               Mapleton, Illinois 61547
21                             (309) 231-8936

22

23          Jennifer E. Johnson, CSR, RMR, CRR
                U.S. District Court Reporter
24              Central District of Illinois

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer

1       (Proceedings held in open court.)

2       THE COURT:  All right.  You might call the

3    case.

4       COURTROOM DEPUTY:  Call the case of the United

5    States of America vs. Charles A. Hewitt, Criminal

6    Case 18-10059.

7       Counsel, please enter your appearance.

8       MS. LEGGE:  Kate Legge on behalf of the United

9    States, Your Honor.

10       MR. LOEFFEL:  William Loeffel on behalf of

11   Charles Hewitt, Your Honor.

12       THE COURT:  And the record will reflect the

13   presence of the defendant.

14       This matter is before the Court today for

15   sentencing.  The presentence investigation report

16   was furnished both sides for comment.  Comments

17   received from the parties are reflected in the

18   addendum to the report found at pages 44 -- I'm

19   sorry, pages 29 -- 28 and 29 -- well, 29.

20       Are there any corrections or modifications to

21   the report?

22       MS. LEGGE:  Not from the government, Your

23   Honor.

24       MR. LOEFFEL:  There is, Your Honor.

25       With respect to the status of Mr. Hewitt's

high school diploma, I was able to get ahold of a

copy from -- of his diploma from Metamora High

School and provided that to Probation, and I

believe that the PSR should be corrected to note

that the receipt is verified.

THE COURT:  Thank you, Mr. Loeffel.  The Court

was going to indicate that it has discussed this

report with Probation, and Probation also indicated

that the defendant did graduate from Metamora High

School, and I am going to so indicate that in

paragraph 106.  The first sentence would be

modified to read, "The defendant stated that he

graduated from Metamora High School, Metamora,

Illinois, in 1991," which has been verified.

There is another modification needed, it

appears, based on my conversation with Probation,

and that relates to paragraph 144 under the heading

"Restitution."  I believe I've been told that there

has not been a request for restitution by or on

behalf of any identifiable victim, so it's my

suggestion that paragraph 144 should be modified to

reflect that.  And I would suggest a sentence to

the end of that paragraph that would read, "There

has not been a request for restitution by or on

behalf of any identifiable victim, so restitution

1  is inapplicable."

2      MR. LOEFFEL:  Your Honor?

3      THE COURT:  Yes.

4      MR. LOEFFEL:  I believe that since restitution

5  is not being requested that paragraph 136 would be

6  stricken as a condition of supervised release.

7      THE COURT:  Mrs. Legge?

8      MS. LEGGE:  Yes, Your Honor.  Thank you.

9      Pursuant to the new statutory changes under

10 18 United States Code 2259(a) for assessments in

11 child pornography cases, I don't believe that the

12 victims have to come forward to be eligible to

13 receive restitution.  And under that new statutory

14 scheme, which is reflected in the PSR that it shall

15 be no less than $3,000, I do believe that that

16 would be appropriate in assessing that amount per

17 the victims -- the three victims in the indictment

18 would, indeed, be appropriate.  I do not think that

19 they have to make a formal request under these new

20 statutory changes pursuant to statute.

21     THE COURT:  Probation, do you have any

22 information that would be inconsistent with what

23 Mrs. Loeffel -- Mr. Loeffel or Mrs. Legge is

24 saying?

25     PROBATION OFFICER:  Under the statute, the

1   Court would have to make a determination of the
2   full amount of victim losses that were incurred or
3   reasonably projected to be incurred, so I would
4   imagine that the Court would have to have some
5   information in order to make that determination
6   first before proceeding to imposing an amount of
7   restitution.
8       THE COURT:  Well, let me ask this question.
9   If it's true that it's mandatory that restitution
10  be awarded, at least $3,000, perhaps it would be
11  more appropriate -- even though there's been no
12  identifiable victim who has requested it, assuming
13  that Mrs. Legge is correct when she says a victim
14  doesn't have to request it and that it is -- must,
15  up to $3,000, be imposed, unless that point is
16  challenged it would make sense, I would think, to
17  -- I'm not so sure we have to change really
18  anything except in paragraph 144.  The modification
19  that I suggested could just stop, that there's not
20  been a request for restitution by or on behalf of
21  any identifiable victim, period.
22      And then I would not eliminate the rest of
23  that sentence which was, "so restitution is
24  inapplicable."
25      I'm accepting Mrs. Legge's legal position that

1  the victim doesn't have to request it, and if they

2  don't request it, that would require Probation to

3  calculate or determine their total loss, I would

4  think the Court would be justified in awarding them

5  the minimum of $3,000.

6      Does that seem the appropriate thing,

7  Mrs. Legge, in light of your understanding of the

8  law?

9      MS. LEGGE:  Yes, Your Honor.

10      And I think the other option is that we could

11  bifurcate the restitution hearing and have that

12  separately from the sentencing hearing in order to

13  brief the Court on the new statutory changes and

14  what that means as far as the victims' rights.  So,

15  that would be another option.

16      THE COURT:  Well, let's see if there's any

17  contrary position by Defense Counsel because if the

18  Court does bifurcate it, it's my understanding that

19  I would then require Probation to prepare a

20  separate report with reference to the issue of

21  restitution, and it would then have to determine

22  the total amount of losses of a victim by obtaining

23  information from the victim with reference to

24  allowable expenses and then consider all of that

25  and give both sides a chance.  That would be put

1  off for at least 90 days.

2      And the alternative would be to just provide

3  the minimum to the victims who have been identified

4  in the presentence report.  Otherwise, I think

5  there's going to have to be some investigation by

6  Probation and come up with a list to try to

7  identify as many other victims as it can.

8      So, what's defendant's position on this issue?

9      MR. LOEFFEL:  Your Honor, we would not object

10  to the imposition of the statutory minimum $3,000

11  restitution.

12      THE COURT:  Well, that to me -- the Court

13  believes would be appropriate so the Court's going

14  to vacate that portion of the modification by

15  interlineation made to paragraph 144 by taking off

16  the phrase, "so restitution is inapplicable,"

17  because I find that's not the case.  Restitution is

18  applicable.

19      Does either party object to that?

20      MS. LEGGE:  I have no objection, Your Honor.

21      And just so that the record is clear, there is

22  a paragraph in the plea agreement that the parties

23  previously agreed on that the defendant would pay

24  that restitution to the three victims identified in

25  the indictment.

1    THE COURT:  Yes.

2    MS. LEGGE:  Victims A, B and C.

3    MR. LOEFFEL:  No objection, Your Honor.

4    THE COURT:  Very well.

5    Having reviewed the presentence report, the

6  Court would indicate it accepts the plea agreement

7  between the defendant and the government pursuant

8  to Rule 11(c)(1)(C) of the Federal Rules of

9  Criminal Procedure that provides for a specific

10  sentence if the Court accepts the plea agreement,

11  and that specific sentence would be 25 years on

12  Count I and 10 years on Count IV to run consecutive

13  for a total of 35 years, and a ten-year term of

14  supervised release.

15    Having approved the presentence report, the

16  Court would indicate it intends to sentence the

17  defendant consistent with the plea agreement to a

18  total of 35 years imprisonment to be followed by a

19  ten-year term of supervised release as called for

20  under the plea agreement.

21    There being -- according to the addendum,

22  there are no objections to the presentence report

23  by the government.

24    Is that still the case, Mrs. Legge?

25    MS. LEGGE:  That is, Your Honor.  I have in

1  the meantime received three victim impact

2  statements and will be offering those up to the

3  Court at the appropriate time.

4       But as far as objections to the PSR or any

5  other corrections, we have none.

6       THE COURT:  Mr. Loeffel, have you had a

7  reasonable opportunity to discuss the presentence

8  report -- the revised presentence report with your

9  client, Mr. Hewitt?

10      MR. LOEFFEL:  Yes, Your Honor.

11      THE COURT:  And are there any objections to

12  the presentence report revised as --

13      MR. LOEFFEL:  There is no objection to the --

14  to the presentence report.

15      We are going to request a clarification with

16  respect to paragraph 121 which would be mandatory

17  drug and alcohol treatment and monitoring as a

18  condition of supervised release as we do not

19  believe that he -- the record indicates that he has

20  a drug and alcohol addiction.

21      THE COURT:  Well, I know the government hasn't

22  had any notice of that objection.

23      Probation, would you weigh in on this and tell

24  me why Probation feels that that -- did you say

25  paragraph 121, Mr. Loeffel?

1       MR. LOEFFEL:  Yes, Your Honor.

2       THE COURT:  Okay.  Would you explain why that

3  paragraph is considered needed for probation

4  purposes?

5       PROBATION OFFICER:  Your Honor, there was no

6  recommendation for drug testing as a condition of

7  supervised release.  Paragraph 121 is language from

8  the statute.  And as you can see at the last

9  sentence, the Court can suspend the mandatory drug

10  testing if it determines that there is no history

11  of substance abuse.

12       THE COURT:  Okay.  Is there a history of

13  substance abuse?  I don't see any set forth in the

14  presentence report.  Am I correct?

15       PROBATION OFFICER:  I don't see any set forth

16  in the presentence report, which is why there was

17  no condition of supervised release proposed

18  recommending substance abuse treatment.

19       THE COURT:  Okay.  Mr. Loeffel, I don't see

20  anything objectionable about paragraph 121.  All it

21  does is that -- is that he could be subject to a

22  mandatory drug testing requirement if the Court

23  finds that his offense was drug related, and based

24  on what Probation says and my own review of the

25  report, I don't believe there is a history so there

1  would not be -- a condition of supervised release
2  will not be mandatory drug testing.
3      MR. LOEFFEL:  Thank you, Your Honor.
4      THE COURT:  Okay.  There being no objections
5  to the report by either side, the Court adopts the
6  presentence report without change except as
7  modified by interlineation by the Court here today,
8  and the Court finds that the defendant's advisory
9  guideline range is as set out in the report.
10     His total offense level is 35, Criminal
11 History Category Roman numeral V.  Under the
12 sentencing table, that produces a guideline
13 imprisonment range of 262 to 327 months, and that's
14 for Count I.  The guideline sentence for Count IV
15 is the minimum term of imprisonment required by
16 statute, which is ten years.  The supervised
17 release range, five years on Count I and five years
18 -- well, Count IV is not applicable.  The fine
19 range, 40,000 to $400,000.  Mandatory special
20 assessment of $200.  And restitution of $9,000,
21 3,000 per each of the three victims.
22     Does either side disagree with that
23 calculation of the defendant's advisory sentencing
24 guideline range?
25     MS. LEGGE:  No, Your Honor.

1    MR. LOEFFEL:  No, Your Honor.

2    THE COURT:  The presentence report is hereby

3  placed in the record under seal.  On appeal,

4  counsel shall have access to the sealed report but

5  not the Recommendation section.

6    Anything in aggravation before the Court

7  imposes sentence, Mrs. Legge?

8    MS. LEGGE:  Yes, Your Honor.  Prior to my

9  comments, I would like to present three victim

10 impact statements to the Court, and at this time I

11 would ask -- two of the victims and their families

12 are present in court today, and so I would ask

13 them, beginning with ███████, to come forward and

14 read a statement to the Court.

15   THE COURT:  Very well.

16   VICTIM A:  Good afternoon, Your Honor.

17   THE COURT:  Good afternoon.  Could you put

18 your name in the record again, please?

19   VICTIM A:  I am ████████████.

20   THE COURT:  Okay.

21   VICTIM A:  I am now 17; I was 15 when this

22 happened to me.  When Charles Hewitt and I first

23 started talking, it was on MeetMe.  Then he got my

24 cell phone number, and we started talking, but he

25 played it off as a 17-year-old boy.  He said he had

a son.  I don't know if he has a son or not, but
that's what he told me.  And his profile had a
young looking guy that had abs, was shirtless, and
the way he talked to me, it was like a dream I had
been wanting to happen.  He looked dreamy on his
profile because he looked like a hot model, you
know.  What girl wouldn't --

THE COURT:  Excuse me for interrupting you,
but I want to make sure, we want the name deleted
from this.

MS. LEGGE:  Thank you, Your Honor.

THE COURT:  Why don't we just call her
Victim A.  Okay.

VICTIM A:  He was super sweet.  He would say
something like, *Good morning, Beautiful,* or, *Good
morning, Babe.*

He kept bugging me about meeting up.  He
really made me think that he was young.  He wanted
me to buy -- or he wanted to buy me a computer,
laptop, Xbox 360 games, and he also wanted to get
me pregnant.  He wanted me to be the stepmom of his
son.  I don't know if he has a son, like I said
before.  I honestly don't know when he wanted to
get me pregnant, but this is at the time when like
we were talking.

And then when he finally came to meet me, I was super scared. I was shaking, and I was trembling, and I didn't know who he was or anything about him because, like I said, I met him on MeetMe so I didn't know completely anything.

I don't remember if he sent me an actual picture of himself so I cannot prove that, but when I met him, I felt like I was going to be kidnapped, tied up, raped, or beaten because that's what my mom warned me about with older strangers.

And when he got out of the car, he kissed me and started touching me and made me feel sick to my stomach, like I was going to puke all over because I've never been so scared in my entire life until that moment.

He also started touching me like sexually so it was like up here, you know, and places that I did not want him to touch me in.

He then started talking about what he wanted to buy me and when he was going to get me pregnant, which I don't remember. I'm still a little like not remembering it because it's been so long ago, but I do remember this.

I -- we started making out, which I didn't like, so I pulled him away. And he hugged me, and

then I accidentally -- like accidentally called
911, but it was on purpose because I was trying to
get away.  I was scared.  I didn't want to be
kidnapped; I didn't want to be raped or beaten or
anything like that.  And they sent an officer to my
house because him and I met at the street next to
me, which was North Emma Street in Clinton,
Illinois, by the -- my house, in the woods.

My mother -- I will not name her, but my
mother called out for me, and she was like very
scared because the cops were at my house, you know,
looking for me to see if I was all right.

And then I told the officer everything was
fine because I was scared.  I did not know, you
know, what to think of or -- because that was the
first time anything like that has ever happened to
me.  I did not think to do anything about it, so --

I was then told, about three or four months
later, by my mom that she got a call from the
detective, Detective Scott, that I had been talking
to someone in their late 40s, and that was -- they
were looking for him.  They had seen that -- like
everything we texted, and it just brought back a
lot of memories.

I'm sorry.

1    When they showed me his picture to like
2 identify him, I immediately started crying because
3 it brought up all the memories that had happened,
4 and, you know, it still hurts to this day because I
5 never thought that this would have happened.  I
6 knew exactly which one he was because I remember
7 that face, and I'll always remember that face.

8    I, as a young -- sorry.  I, as a young
9 teenager, then and now never thought I would have
10 to go through this horrible thing called sexual
11 assault, but as of today I am stronger than I have
12 ever been before because I have tons of support
13 from counselors and my mother and Kate and Officer
14 Scott.  I have been rebuilding myself to be a
15 better person to show the other girls who he has
16 met up with that it will get better, and anything
17 is possible for myself to show courage.  I want
18 justice for me and those girls because this is not
19 right.

20    THE COURT:  You're a very brave young woman
21 and --

22    VICTIM A:  I wanted to do this because I
23 wanted to make sure that my voice is heard on what
24 he did.

25    THE COURT:  Well, it wasn't easy to come

1 | forward and speak here today.  I understand that.

2 |     VICTIM A:  No, it really wasn't.

3 |     THE COURT:  And, obviously, because of your

4 | courage to step forward, the defendant is going to

5 | be held responsible, and he's going to be taken off

6 | of the street.  Obviously, he took advantage of

7 | your youth, your inexperience, your innocence.

8 |     So, from what you say, I gather that this has

9 | been somewhat of a learning experience for you.

10 |     VICTIM A:  Yeah.

11 |     THE COURT:  And I'm -- and I want you to come

12 | out of this feeling good about yourself.

13 |     VICTIM A:  I feel really good about this, Your

14 | Honor.  I never in a million years thought this

15 | would have ever happened, but I'm glad it did when

16 | it did because now I can show everyone else that,

17 | you know, you can be strong; you can have the

18 | courage to do it.

19 |     THE COURT:  Yes.  And you can modify your

20 | behavior because you see how things can get out of

21 | hand and how one's curiosity or -- can be misused.

22 | So, I hope you feel that, even though it was a bad

23 | situation, it could have been worse.

24 |     VICTIM A:  Could have.

25 |     THE COURT:  And you have learned from the

1  experience and hopefully something that will cause

2  you to be a much stronger person going forward.

3  And I appreciate your willingness and your bravery

4  in coming forward.

5      Thank you very much.

6      VICTIM A:  You're welcome.

7      MS. LEGGE:  Can I have just one moment, Your

8  Honor?

9      THE COURT:  Yes.

10     (A pause was had in the record.)

11     MS. LEGGE:  Your Honor, at this time I have

12 brought forward the victim named in the indictment

13 with the initials M.V., and she has prepared a

14 statement and wishes for me to read it to the Court

15 on her behalf.

16     THE COURT:  Very well.

17     MS. LEGGE:  "Your Honor, because of being

18 sexually assaulted by him, it has caused me to be

19 very stressed, and I have been doing poorly in

20 school.  In my school day, it is constantly on my

21 mind, and I am distracted, and I am unable to do

22 well in my classes.  I feel like it has been my

23 fault, but he took advantage of me, and I let it

24 happen, but then again I didn't let it happen.

25     "I have trust issues because of this.  If I

1  meet people online, it's hard to trust because of

2  this.  It also makes me hard to trust anyone

3  because I was taken advantage of.

4      I had to see one counselor at BraveHearts, and

5  she moved so I had to go to another one, and it's

6  hard to explain all of this again and again.  It

7  stresses me out because I have to keep explaining

8  it, and I've explained it so many times.

9      "This person has done this, and for my whole

10  life I have to tell the story before I can trust

11  anyone.  When I have to tell people, I feel guilt

12  and shame because I continue to think it is my

13  fault.

14      "This has not just affected me, but it has

15  affected my mom and her being able to not be at

16  work.  She's continuously had to take time off to

17  take me to counseling and put miles on her car and

18  spent money on gas.

19      "I have memories on my phone that I don't have

20  now, and they punished me and took something away

21  from me when it wasn't my fault, and it makes me

22  very upset.

23      "He snuck into my window and had sexual

24  intercourse with me while I was sleeping."

25      Thank you.

1     THE COURT:  Again, I want to say how much I

2  admire your courage and bravery, too, in coming

3  forward.  It's certainly something very hard to do,

4  to have to remember what happened and how -- you

5  might say, *How did I let myself get in this*

6  *position?*

7     Well, that's something that I'm sure you have

8  discussed with your parents, and they with you, and

9  with the officer and with the prosecution, with

10  other persons.  And I'm confident you have learned

11  from this experience, and you have thought about

12  how you could have handled things differently and

13  whether or not you used good judgment, whether or

14  not you acted in ways that you knew you should or

15  should not act.  Fortunately, things could have

16  been a lot worse.

17     And, again, here's a situation where you were

18  taken advantage of, your youth, your immaturity,

19  your lack of experience, and hopefully you have

20  learned some things about yourself that will cause

21  you to make different judgments and better

22  judgments going forward, and you realize that you

23  don't need this type of relationship in your life.

24  You're okay without that.

25     So, all I can say is that the agreed

disposition in the case, in my judgment, is substantial, and it satisfies what justice demands in this case.

But as I mentioned earlier, without strong and brave people like you and the other Victim A who spoke, who knows how many other susceptible young women would be entrapped by this defendant.

So, you have -- at a very painful cost, in my judgment, you served the interest of the public and the community, and hopefully the defendant will no longer be in a position to entice or persuade any other young girl to put themselves at risk.

So, I want to thank you also.

Anything else in aggravation?

MS. LEGGE: Yes, Your Honor. We have a third and final statement on behalf of -- from the mother of one of the victims who would like me to read it to the Court on her behalf.

THE COURT: Yes.

MS. LEGGE: "This has not only affected M.V. but our whole family. She suffers from extreme anxiety and poor self-body image, among several other things. She has seen many counselors and psychologists. She has been on several medications, and she continues to do both.

1   "This has caused trust issues in the family,
2   and I have had to take off a lot of work.  Missing
3   is from her having problems at school and her
4   having to leave early.  Days -- there are days she
5   cannot get out of bed, me having to take her to
6   several appointments.

7   "This will affect us for the rest of our
8   lives."

9   THE COURT:  I want to thank this mother
10  because you have verbalized what every mother,
11  every parent would feel.  And I don't want to --
12  but I must say that sometimes we, as parents, can't
13  control whether or not our kids follow our advice,
14  but we have the satisfaction of knowing that we did
15  warn them; we did tell them how they should behave
16  and what they should or should not do with
17  strangers.  But it's common knowledge that in this
18  modern age where you have internet, it's a very
19  attractive mode of communication, where you don't
20  get to see people face-to-face, and it's private.
21  You don't have to expose yourself publicly.  It's a
22  big deal that's happening nationwide and worldwide.
23  And as parents we wonder, How could they?

24  Well, I'm not a psychiatrist.  I can say that
25  because I don't think it necessarily reflects on

the relationship between a parent and a child.
It's just the nature of what's happening today.
And all we can do is continue to do the best we can
to teach and educate our children how to take care
of themselves and how to judge risks involved in
their behavior.

And even though it's been unfortunate, it is,
I would think, an experience that would cause young
people to think about what they're going to do,
think about what the possibilities are, think more
about whether or not and how far they should go in
getting on the internet and having these private
chats.

So, I know parents, the first thing they do,
they feel guilty; somehow it's their fault.  But
when you know you've done the best you can to teach
your children what to do to protect themselves and
the perils of getting involved on the internet, I
guess the only other thing one can do is a tough
decision and that is to do more monitoring, but you
don't want to do that because you want to trust
your child -- your children, and so you have hard
choices to make.

I know this is terrible, but if you were aware
of all the situations that I see in this court, see

here in this court, as bad as your experience is,
you would see it as being minimal.  So, in one
sense you and your child are very lucky because
typically it's much worse with a young child who is
enticed and exploited to do things that they know
is wrong, but they allow themselves to get
involved.

I do believe, based on what I've heard here
today, that a lesson has been learned.  And if
these girls are as bright as I believe they are,
they're going to look at their parents with greater
respect and a greater awareness that, you know, my
parents know best, and I should listen to them
more, and I should try to learn from them more.

So, the final thing is that because of these
girls and good investigation work by law
enforcement, this defendant is going to be
sentenced probably to a term of imprisonment that
will be throughout the rest of his life or pretty
close to it, and so -- and I think others who, like
him, may be motivated to do something like this,
they're going to think twice about it because they
don't want to spend the rest of their life in
prison.

So, I know it wasn't easy for either of the

victims or their parents to come forth today and to
admit publicly what happened. It's -- obviously,
it's embarrassing. But, you know, no one's going
to paint a scarlet letter on your forehead or on
your back. I expect you to learn from this, carry
on, and become the good person and the -- with a
future that you can be and put this behind you.

Is there anything in mitigation, Mr. Loeffel?

MR. LOEFFEL: No, Your Honor.

THE COURT: Mr. Hewitt, before I impose
sentence, you have a right to address the Court in
your own behalf.

I'm sorry?

MS. LEGGE: Your Honor, I believe the parties
would like to make a statement just in argument.

THE COURT: Oh. Which parties?

MS. LEGGE: The government. I would like to
make a statement in argument.

THE COURT: Oh, I'm sorry. Sure.

MS. LEGGE: Thank you.

Your Honor, Charles Hewitt, a registered sex
offender, found and preyed on these minor girls.
He then lied to them, and he tricked them, and then
ultimately he sexually abused them and exploited
them for nothing other than his own sexual

1  gratification.

2      He found these girls on the internet where he

3  could tell a story that he created.  He lied to

4  them, and he tricked them and led them to believe

5  that he was a 17-year-old attractive young male

6  with -- as described in the discovery and by one of

7  the victims -- with six-pack abs.

8      And he tricked them into believing a

9  relationship was looming, that he would be their

10  Prince Charming.  He would send them the, "Good

11  morning, Gorgeous," text messages or the, "Babe,

12  how was your day?" or, "How was school today?" the

13  compliments that, up until their relationship or

14  purported relationship with him, they had not had

15  in their lives.

16      He then turned that on them and sexually

17  exploited them by enticing and coercing these young

18  females to take images, sexually explicit images of

19  themselves and send them to him, all while not

20  being the person he truly was, not only not telling

21  them his true name or his true age but not telling

22  them that he's a registered sex offender at that

23  time because by the way -- by way of his past

24  conduct, he had molested a different minor female

25  and had been sentenced to the Illinois Department

of Corrections in Woodford County for an aggravated

sexual abuse charge just years prior to this

conduct.

      And as a result of that, the laws of our

state, the laws for the United States as well as

society decided that someone like him, someone

who's been convicted of a sex offense against a

minor, has to register and be restricted from

certain -- from certain privileges such as where he

lives, what he can -- where he works, where he

resides, what kind of identity he has online, not

to mention none of the email addresses or social

media identities that he had were reported to the

sex offender registry.

      So, after he preyed on these girls, lied to

them about who he was, tricked them into believing

that he truly loved them and cared about them, he

then went into what is one of the most private

aspects of a relationship and coerced them to take

these sexually explicit photos and send them to him

so then he could use them -- use those photos

against the girls.  And because of that, these

young women and these young girls have become

victims of not only sexual assault, as the Court

knows from the PSR, but also a sexual exploitation

1  online.

2      The case started in April of 2018 when the

3  United States Secret Service received a lead out of

4  Minnesota based on a 12-year-old minor who had sent

5  nude photos to this defendant.  Investigators were

6  able to follow up on the MeetMe or Skout profile

7  identity that he used and, through various legal

8  process means, were able to identify that it was

9  indeed this defendant, Charles Hewitt, who resided

10  at that time in Peoria, Illinois, and then later

11  moved to Creve Coeur.

12      They were able to discover the identity of

13  female victim Minor Victim A who lived within the

14  Central District, and based on a forensic review of

15  those chat messages, they discovered that Hewitt

16  had had contact with that minor victim.

17      And those chats show that he did have a

18  profile picture as a shirtless, young male with

19  six-pack abs with the name of John and began

20  sexually explicitly talking her into sending photos

21  of herself.

22      Hewitt, the person behind the keyboard,

23  eventually drove to this minor victim's town, which

24  was within the Central District of Illinois, met up

25  with her, and offered to drive her to a mall.  And

thankfully she declined, but instead he attempted to pull her into the woods and began kissing and groping her.  As we know, she was able to get away by calling 911 and has that memory forever etched in her mind as now a victim of both sexual abuse and sexual exploitation.

The text messages that this Defendant Hewitt sent the victims -- Victims A, B and C -- all included knowledge of their age, knowledge that he was tricking them from the angle that he was attempting to portray a 17-year-old, but the messages included, "Can you get pregnant?  Are you a virgin?  Go in the bathroom and take pictures of your pussy, please.  Do you want to have sex with me a lot?  I bet you're gonna be tight as hell. And I'm bringing a condom."

In one string of text messages or chats between the victim and Hewitt, he attempted to blackmail the victim because she would not continue to send sexual images to him and attempted to convince the minor female that he was going to commit suicide if she did not either agree to send more nude photos or if she would not agree to meet up with him.

One of these minors, he took a screenshot of

the front of her house because he determined where
she lived here within the Central District of
Illinois and sent that image to her house -- or,
excuse me, to that victim threatening to show up at
her house if she did not agree to have sex with him
that very night with no condoms.

The text messages of this kind -- however
heinous and gruesome and, quite frankly, violent in
nature -- were not limited to just the three
victims that were named in the indictment.  Once
Hewitt was arrested and his mobile phone was
forensically downloaded, there revealed an excess
of 5,200 chat messages and phone calls -- however,
mostly messages -- which were almost entirely
between Hewitt and numerous females that involved a
scheme very similar to what I have just discussed
wherein he would begin posing as a young male,
John, always under the age of 18.  They would chat
for a while, oftentimes him providing compliments
and the romantic attention.  And then the
conversation would turn to threats that either his
dad would take over the -- his purported dad would
take over the conversation or that John would
continue the conversation and asking and
threatening and attempting to coerce the young

women into providing nude photos.

In his interview, Hewitt admitted that he used this profile of a 14- or 15-year-old male. He admitted that he would drive -- he drove somewhere to meet a female, of course denying that anything happened. Admitted that he would sometimes pretend to also be this younger male's dad in the conversations. And admitted that he would save and view child pornography images to satisfy his urges to be with underage girls.

Because of Mr. Hewitt's actions, the victims not only present and courageously making statements to the Court today, their lives have forevermore been changed, but there are countless other victims who were preyed upon by Hewitt and either were able to successfully shut down the conversation or were unable to be identified through the investigation.

So, here the defendant, at 48 years old, sits before you. Violated the law repeatedly throughout his entire life. And I won't go through his entire criminal history, but it started at 17 when he began committing burglaries, thefts, stealing from people, escalated to his aggravated criminal sexual abuse in the Woodford County prior conviction, and then to here. So, over time, not only has he

violated the law just outright, but here he
purposely disregarded the sex offender laws that
would have kept our community safe had he been --
had he not lied about his identity and lied about
his social media presence.  And for this continuous
and absolute disregard for the law, we believe that
the sentence of 35 years is not only appropriate
but a just one in light of the crime as well as the
harm done to these victims.

The goal of the Sentencing Reform Act and the
goal of any of the factors under 18 United States
Code 33 -- excuse me, 3553(a) is finding a sentence
that will promote respect for the law and serve as
a warning to individuals who are considering
similar conduct, but in our view, one of the
factors that is most important here is to protect
the community from further actions of this
defendant.  And I would submit that it's not only
the community at large but specifically the most
vulnerable of our community, which is our minor
children, because I have no confidence, looking at
the criminal history, looking at the conduct here
that if it weren't for such a significant sentence
to the Bureau of Prisons that I would have no
confidence that this defendant would abide by the

1  laws of our state or federal statutes and not

2  continue a pattern of harming minor children.

3      When you look -- when you remember the

4  statements that these victims gave to you earlier

5  today, they thought he was dreamy; they had a

6  belief in that love and that companionship; and as

7  the Court aptly put, their youth provided a level

8  of innocence that has now been stripped away

9  forever from them.  And instead, those words that

10  you heard from them -- they were scared, they feel

11  guilty, they feel like this was a punishment, it's

12  upsetting, they have anxiety over it, they have

13  trust issues over it, they are -- it is stressful.

14  And if it weren't for the courage and tenacity of

15  these young women and the strength to stand up here

16  and tell the Court the trauma that they have been

17  through, I believe it would deprecate the

18  seriousness of the offense to otherwise not

19  highlight what they have gone through and what they

20  will continue to go through from what Hewitt did to

21  them.

22      It's no doubt the child exploitation offenses

23  are grave offenses, and we know that it inflicts

24  harm on any victim, but here we have what I would

25  submit is immeasurable harm on the victims before

1   you -- physically, mentally, emotionally because he

2   would prey on them, and he lied to them, and he

3   tricked them, and he turned that into sexually

4   abusing them and exploiting them.  And for those

5   actions, he should serve what the government

6   believes will be the remainder of his life, 35

7   years in the Bureau of Prisons, because justice

8   demands it, and above all else, the victims deserve

9   that.

10       Thank you.

11       THE COURT:  Mr. Loeffel, comments by defense

12  counsel.

13       MR. LOEFFEL:  Thank you, Your Honor.

14       Your Honor, we agree that a sentence of 35

15  years -- that is the remainder of Mr. Hewitt's life

16  -- is an appropriate sentence under 3553 factors.

17       We do disagree with some of the government's

18  reasoning, however, regarding the offense conduct.

19       The government says that the communications

20  are violent in nature, that there's an element of

21  violence here.  The government has just made

22  reference to physical harm.  And I would submit

23  that, looking at the nature and circumstances of

24  the offense, that there is harm, but there is not

25  physical harm.  There was not actual violence here.

And if you look at Mr. Hewitt's record and his record going back to 1988, paragraph 57 -- I believe that's his first offense -- he is not a violent -- he's not a violent person. That is significant.

With respect to the offense conduct, I would state that it is terrifying. It's especially terrifying if you are a parent. We all know that the -- that social media is something that is so often misused and used to exploit vulnerable people -- children in this case -- and there's no excuse for that.

We should note that Mr. Hewitt has accepted full responsibility for his conduct and has accepted the sentence, that Mr. Hewitt was cooperative with law enforcement when law enforcement did speak with him. He did own up to what he did.

An element of 3553, Your Honor, that I do want to address, though, is given Mr. Hewitt's age and given his physical limitations, believe that it is necessary that the Bureau of Prisons address some of the serious physical conditions that he suffers from that are noted in paragraphs 91 through 97. He particularly has some serious orthopedic

1  conditions regarding, regarding degeneration of his
2  knees.

3      In addition, Your Honor, Mr. Hewitt suffers
4  from a psychological sickness and a psychological
5  sickness that drove him to do what he did, so it is
6  our request and we would request the Court's
7  recommendation that he receive sex offender
8  treatment in the Bureau of Prisons.  I know it's
9  not offered at all facilities, but we would
10  certainly wish his classification in the Bureau of
11  Prisons would allow him to access sex offender
12  treatment.

13      And finally, Your Honor, we would request that
14  Mr. Hewitt be housed at an appropriate facility as
15  close to Peoria as possible, if possible, the Pekin
16  facility as he does have relatives, family members
17  and friends who he would like to maintain contact
18  with.

19      Thank you.

20      THE COURT:  Thank you, Mr. Loeffel.

21      Now, Mr. Hewitt, you have the right to address
22  the Court yourself and make a statement in
23  mitigation.  If you wish to do so, please join your
24  attorney at the lectern.

25      MR. LOEFFEL:  Your Honor, Mr. Hewitt chooses

1  to waive his statement in allocution.

2      THE COURT:  Very well.

3      You know, just like parents, adults in our

4  courts and our law enforcement, our neighbors, our

5  friends, our churches, our schools, we all have an

6  obligation to protect those who can't protect

7  themselves, and that includes young children, young

8  girls, teenage girls who are still juveniles

9  because it's true they simply don't make good

10 judgments.  They don't have that experience yet.

11 And to be honest, frequently at certain teenage

12 years, there's this period where they're trying to

13 find themselves, trying to understand themselves,

14 trying to understand the physical and emotional

15 changes that are naturally taking place.

16     They're growing up in an environment where

17 they are told that physical attractiveness defines

18 who they are.  And we all want to be liked, and

19 quite often we do things that we know we shouldn't

20 do in order to get that approval, whether it's from

21 our parents, friends, neighbors or from predators

22 like Mr. Hewitt.

23     And he was quite the predator.  He took

24 advantage of the weaknesses, the vulnerabilities of

25 his victims to entice them to deviant sexual

contact, sexual conversations.

And what else can I say about this?  It's obvious that Mr. Hewitt is a danger to the community.  He can't be trusted to have contact with our young because he's going to exploit them. That's what he's been doing for a long time -- taking advantage of their naivete, taking advantage of their unhappiness with themselves or their situation, their feelings of insecurity, their lack of confidence.  He's taken advantage of that, and through the internet, he can do it in private.

And in most of these cases, the perpetrator is not an old man with an overcoat; you look at him, and you know right away that he's bad news, that he's a pervert, somehow he's a deviant.

In today's age, most of these defendants are presentable.  They are well-received in the community.  They rarely have any serious criminal convictions other than in the area of exploiting kids.

And in this case, I believe justice is served. Thanks to the help of these victims, thanks to the help of some very good law enforcement investigations, Mr. Hewitt has been brought to justice, and he's going to receive a sentence that

will keep him locked up for a long time.

Whatever physical problems that Mr. Hewitt has, the Bureau of Prisons is capable of giving him appropriate treatment.

The Court will make a recommendation that he be placed at a facility that will allow him to participate in the sex offender treatment program.

The Court will also recommend that it be a facility as close to his -- Peoria, Illinois, as possible, but my primary concern there is that it be a facility that will allow him to receive sex offender treatment so that in the event he's ever released he will have had some treatment to deal with his predisposition to take advantage of our young girls.

And I would be amiss -- as a parent would be amiss -- if I didn't point out that we always try to let our children know that one of the ways to stay safe is to try not to put yourself in a position where there is a risk of harm to you. And we know now that involvement in the internet, these chat rooms is a risky business. And when we use them, we are opening ourselves up to the potential of exploitation and abuse because there are people who take advantage of your innocence, your

curiosity, your perhaps naivete; and if they sense

any weaknesses in your character or your

personality -- and we all have them as we are

growing up.  Our bodies are changing; we're

becoming dating age; and we are open, we're

susceptible to sweet-talking by men.

So, I don't want to belabor the point because

I think anyone here today knows what I'm talking

about, and they share my concern that in addition

to trying to prevent these predators from taking

advantage of our children, there needs to be stiff

sentences.  Well, that is what is going to happen

here today.

We also know that perhaps we have to educate

more our children of the dangers involved with

these -- the internet and these chat rooms where

strangers say the most outrageous and most deviant

things they can think of.  Can you imagine

strangers asking the type of behavior that the

defendant asked of these young girls whom he knew

to be under 18?  He knew some were as young as

perhaps 12, 15, asking them to do things that he

knew was wrong because he knew something that a lot

of us parents don't know -- that is, that kids are

very curious today.  They do things that we would

never do.  They don't have the same fears that we
had growing up.  So, we have to do a better job of
and find a way to openly discuss and candidly
discuss the risks involved in these online computer
communications to our children.

And we can't hide our heads in the sand and
think it doesn't happen.  *It won't happen to our
kids.*  It happens to all types of kids all over
this world.  We've seen it in this courtroom.  So,
I think we know what we must do.

Pursuant to the Sentencing Reform Act of 1984
and pursuant to the plea agreement between the
defendant and the government, and in consideration
of the purposes of sentencing as set out in Section
3553(a) of Title 18 of the United States Code, the
defendant, Charles A. Hewitt, is hereby committed
to the custody of the Bureau of Prisons for a
period of 25 years on Count I and 10 years
imprisonment on Count IV to be served consecutively
for a total sentence of 35 years.

The Court finds that the defendant does not
have the ability to pay a fine, so no fine is
imposed.

The Court shall order the defendant to pay
restitution to each of the three victims who have

been identified in this case, as set out in the presentence report, the amount of $3,000.

The defendant shall serve a ten-year term of supervised release. And while on supervised release, he cannot commit another federal, state or local crime, nor possess a controlled substance.

He must comply with the requirements of the Sex Offender Registration and Notification Act as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he resides, works, is a student or was convicted of a qualifying offense.

The Court finds that the defendant does not present the likelihood of future substance abuse and waives the mandatory drug testing requirement pursuant to Section 3563(a)(5) of Title 18.

Pursuant to statute, the defendant shall cooperate in the collection of DNA as directed by the probation officer or the Bureau of Prisons.

In addition to those mandatory conditions of supervised release as required by statute or the sentencing guidelines, the Court will impose the following conditions of supervised release.

Enclosed in the presentence report, attached was the various special conditions that the Court

1   would be considering.

2       Mr. Loeffel, have you had a chance to discuss

3   those referenced conditions -- special conditions

4   of supervised release with your client?

5       MR. LOEFFEL:  Yes, Your Honor.

6       THE COURT:  Is it your perception that he

7   understands the various conditions?

8       MR. LOEFFEL:  Yes, Your Honor.

9       THE COURT:  Mr. Hewitt, supervised release is

10  not considered as punishment.  Punishment is the

11  prison term that you are receiving.  Supervised

12  release is supposed to be supervision by the

13  probation department to help rehabilitate you for

14  return to the community as a law-abiding citizen

15  and one who is no longer a danger to the society.

16      And if you violate any of those conditions of

17  supervised release, you can be sent back to prison

18  for a new term of imprisonment.  Therefore, it's

19  important that you understand what those special

20  conditions are so that you can comply with them.

21      So, I'm going to read off the special

22  conditions to you, give you -- and tell you why I'm

23  imposing them and give you a chance to ask any

24  questions of the Court if it relates to a condition

25  that you don't understand because I'm going to

1  assume you do understand them, so if you do violate
2  one, I will take appropriate action.
3       You cannot knowingly leave the federal
4  judicial district -- this federal judicial district
5  without the permission of the court or your
6  probation officer.
7       You must report to the probation office in the
8  district to which you are released within 72 hours
9  of your release from custody.  You shall report to
10 the probation officer in a reasonable manner and
11 frequency as directed by the court or your
12 probation officer.
13      You must follow the instructions of the
14 probation officer as they relate to conditions of
15 supervision.  Any answers you give in response to
16 the probation officer's inquiries relating to
17 conditions of supervision must be truthful.  This
18 condition does not prevent you from invoking your
19 Fifth Amendment privilege against
20 self-incrimination.
21      You must notify the probation officer at least
22 ten days prior or as soon as knowledge is gained to
23 any change of residence or employment which would
24 include both the change from one position to
25 another as well as a change of workplace.

All those conditions are considered to be administrative requirements, and they are a necessary incident of supervision by the probation department.  By law, the probation officer is required to keep informed of the conduct and condition of a person under supervision.  The probation officer must conduct visits with the person on supervision in his home and must be aware of address changes and his current whereabouts to meet the statutory obligation.

The defendant shall permit a probation officer to visit him at home or any other reasonable location between the hours of 6 a.m. and 11 p.m. unless investigating a violation or in case of emergency.  The defendant shall permit confiscation of any contraband observed in plain view of the probation officer.

Again, as mentioned, the probation officer is required by law to keep informed of the conduct and conditions of a person under supervision.  The probation officer must conduct visits with the person on supervision in his home or elsewhere to meet this statutory requirement.  And in order to protect the public from further crimes of a person under supervision, the probation officer must be

1  allowed to confiscate any contraband in plain view.

2      Home contact's one of the most valuable

3  activities available to a probation officer.

4  They're used to establish rapport and maintain

5  dialogue with an offender, his family and social

6  network, to serve as a primary strategy for

7  verifying residence, to assess life-style,

8  including factors suggesting a return to criminal

9  conduct, to assess standards of living for ongoing

10 assessment of risk, and the offender's ability to

11 pay criminal debt or meet other obligations.

12     Each of these issues falls into line with the

13 sentencing factors set forth in 3553(a) of Title 18

14 which the Court must consider in determining the

15 conditions of supervised release.

16     With respect to you, Mr. Hewitt, home visit

17 will be an essential tool to provide protection to

18 the community based on the nature of your offense.

19 The probation officer will need to conduct home

20 visits to ensure that you are following state laws

21 regarding residency for registered sex offenders.

22 For example, convicted sex offenders are prohibited

23 from residing near a day care, park or school.

24 Home visits are an essential component to ensure

25 the safety of the community and addressing the

needs of the defendant.

This condition is reasonably related to rehabilitation and protecting the public from recidivism, since it should allow probation officers to help you reintegrate into society after your time in prison and to ensure that you are abiding by the conditions of your supervised release.

You must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. Again, since the probation officer is required by law to keep informed of the conduct and condition of a person under supervision, in order to protect the public from further crimes, the probation office must be aware of any contact you have had with law enforcement to determine if you are yourself involved in criminal activity. This condition is warranted as it assists the probation officer in monitoring your conduct and your compliance with the other conditions of release, specifically the mandatory condition that you not commit any other criminal offense.

You should not knowingly meet, communicate or otherwise interact with any person whom you know to

be a convicted felon or to be engaged in or
planning to engage in criminal activity unless
granted permission to do so by your probation
officer.  The purpose of this condition is to limit
your exposure to triggers of negative behavior.
This condition will allow the probation officer to
effectively supervise and monitor you.

You must participate in a sex offender
treatment program as approved by the probation
office.  You shall abide by the rules of the
treatment provider.  You shall submit to
physiological testing, including polygraph testing.
You shall pay the costs of the treatment to the
extent you are financially able to pay.  The
probation office shall determine your ability to
pay and any schedule for payment subject to the
Court's review of the payment and schedule upon
request.

Given the nature of your offense, this
condition is necessary to address the risk of harm
or danger you pose to the community.  You have
never received sex offender treatment prior.

You should have no contact with any female
under the age of 18 except in the presence of an
adult who is aware of the nature of your background

1   and current offense and who has been approved by

2   the probation office, except in the course of

3   normal commercial behavior or in other cases of

4   unintentional and incidental contact.

5       Given the nature of your offense, this

6   condition is necessary.  The protection of the

7   public from your sexual interest in minor females

8   will be an important component of supervision.  In

9   order to protect the community, you should not be

10  allowed to have contact with any minor female

11  without supervision from an adult who is aware of

12  the nature and background of your offense and who

13  is approved by the probation office.

14      You must participate with the probation

15  office's Computer and Internet Monitoring Program

16  during your term of supervision.  The monitoring

17  program will start as soon as possible after your

18  supervision term begins.  You should sign the rules

19  of the Computer Internet and Monitoring Program and

20  comply with the conditions of this program.  During

21  this time, you shall install filtering software on

22  any computer you possess or use which will monitor

23  access to websites that depict sexually explicit

24  conduct as defined in Section 2256(2)(A) and (B) of

25  Title 18.  You shall allow the probation office

1  unannounced access to any computer you possess or

2  use to verify that the filtering software is

3  functional.  You shall pay the costs of the program

4  to the extent you are financially able to pay.  The

5  probation office shall determine your ability to

6  pay and any schedule for payment subject to the

7  Court's review upon your request.

8      This condition is imposed because you used a

9  smartphone in connection with the instant offense.

10 Monitoring your computer and other internet-capable

11 devices will be an essential factor in the

12 probation office ensuring that you are complying

13 with all the conditions of supervised release.

14     If there's reasonable suspicion to believe

15 that you are in violation of a condition of

16 supervision, you shall submit to the search of your

17 person, automobile or property under your control

18 by the probation office.

19     You should also allow the probation office to

20 conduct periodic, unannounced examinations of your

21 computer equipment, internet-capable devices,

22 similar electronic devices, related computer

23 peripherals which may include retrieval and copying

24 of all data from your devices to ensure compliance

25 with this condition and/or removal of such

equipment for the purpose of conducting a more
thorough inspection.

In order to protect the public from further
crimes, your activities must be monitored.  The
monitoring software will need to be serviced,
updated and checked periodically.  If the probation
officer determines that unauthorized websites or
chat rooms were visited by you or that child
pornography is stored on a computer
Internet-capable device, the officer may need to
conduct a more thorough inspection to ensure that
the monitoring process is working and that you are
complying with the terms of your supervised
release.  Accordingly, if there is reasonable
suspicion to believe that you are in violation of a
condition of supervised release, you should submit
to any reasonable search request.

You should provide the probation officer
access to any requested financial information,
including both your business and personal income
tax returns.  This condition is reasonably related
to restitution.  It will allow Probation to ensure
that you are abiding by the restitution order
imposed in this case.

You shall not incur any new debts or open any

1  additional lines of credit in excess of $200

2  without prior approval of the probation office so

3  long as any amount of restitution is still owed.

4  This condition is reasonably related to

5  restitution.  It will allow the probation officer

6  to ensure that you are abiding by the restitution

7  order imposed in this case.

8      Mr. Hewitt, those are the special conditions

9  that I'm imposing.  Are there any of those

10  conditions you don't understand or you want the

11  Court to clarify for you?

12      THE DEFENDANT:  No, Your Honor.

13      THE COURT:  You understand them?

14      THE DEFENDANT:  Yes, Your Honor.

15      THE COURT:  And you understand that a

16  violation of any of those conditions can result in

17  your being sent back to prison?

18      THE DEFENDANT:  Yes, Your Honor.

19      THE COURT:  About restitution, this is a child

20  pornography trafficking offense, and, thus,

21  restitution is mandatory and required by federal

22  law.

23      The Court is required to determine the full

24  amount of the victims' losses and to order

25  restitution in an amount that reflects your

relative role in the causal process that underlies the victims' losses but which is no less than $3,000. Although there has not been a request for restitution by or on behalf of any of the identifiable victims, the Court is ordering the minimum restitution amount of $3,000 for each victim in this case. Interest shall accrue on restitution unless paid in full within 15 days of date of this order. The Court may waive interest, limit the total interest payable to a certain dollar amount, or limit the length of the period in which interest accrues. The Attorney General may also waive all or part of any interest if the Attorney General determines reasonable efforts to collect the interest are not likely to be effective.

The Court would recommend to the Bureau of Prisons that the defendant be housed in a facility that will allow him the opportunity to engage in a sex offender treatment program and it be a facility as close to the family -- the defendant's family and home in Peoria, Illinois.

If any restitution is owed to any of the victims during the course of the term of supervised release, the defendant is to pay toward all

1   restitution owed up to 40 percent of his disposable

2   income each month until the restitution is paid in

3   full.

4       The defendant shall pay the special assessment

5   of $200 immediately.

6       The defendant -- having waived his appeal

7   rights as part of the plea agreement, the defendant

8   is remanded to the custody of the marshal to await

9   execution of sentence, and the hearing is adjourned

10  unless there is something I've missed.

11      MS. LEGGE:  Your Honor, pursuant to the

12  agreement -- just a couple of matters.  Pursuant to

13  the agreement, the government moves to dismiss

14  those remaining counts, Counts II and III of the

15  indictment.

16      And just for the record, I believe it would be

17  prudent to inquire of the defendant whether the

18  Court has addressed all of his principal arguments

19  in mitigation?  Other than that, the government has

20  nothing else.

21      THE COURT:  Counts II and III of the

22  indictment are dismissed on the government's

23  motion.

24      Mr. Hewitt, are you satisfied that the Court

25  has addressed all of your principal arguments in

mitigation?

THE DEFENDANT: Yes. The only thing that I would ask would be the recommendation for Pekin. I do have an aunt that has angina and heart problems. She's 70 years old, and there's no way she's going to make it much longer.

THE COURT: Well, I did make that recommendation that you be housed in a facility as close to your -- Peoria as possible, and I would suggest or recommend that it be the facility at Pekin, Illinois. However, as I indicated, my primary concern is that you receive sex offender treatment, and you acknowledged in the presentence report you had never received it. Perhaps had you, you might not be in this situation today so I think that's very important, and that overrides the location. Hopefully it will be a facility that will allow you to be as close to your family and friends as possible, but that's my reason. Okay?

Hearing's adjourned.

COURTROOM DEPUTY: Court is in recess.

(Proceedings concluded at 3:36 p.m.)

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

    I, Jennifer E. Johnson, CSR, RMR, CBC, CRR, in and for the United States District Court for the Central District of Illinois, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

    Dated this 9th day of February, 2023.


                <u>/s/ Jennifer E. Johnson</u>
                JENNIFER E. JOHNSON
                CSR, RMR, CBC, CRR
                License #084-003039